## CIRCUIT COURT OF THE CITY OF ROANOKE

Charles W. Dogan

    v.

The Stone Printing & Mfg. Co.,
a Division of Hickory Printing Co.

March 1, 1984

Case No. 83-0542

By JUDGE JACK B. COULTER

Charles W. Dogan (hereinafter called Dogan) was born on December 21, 1898, and hence had just turned eighty-five at the time of the evidentiary hearing in this case on January 6, 1984. In 1919, at the age of twenty-one, he began working for The Stone Printing & Manufacturing Company (hereinafter called Stone) as a printer and was employed continuously by said company for fifty years until 1969 when he retired as General Foreman, Printing, at the age of seventy-one.

While in the active employ of Stone, Dogan received certain employee benefits, including life insurance coverage under several group life insurance plans. The amount of coverage started at $500, rose to $750 after one year of service, and was increased to $1,000 after five years of employment. Subsequently, additional group insurance was provided for salaried employees, which included Dogan, so that at the time of his retirement in 1969 Dogan had $8,500 in group life insurance. This insurance was provided under two policies, one through Shenandoah Life Insu-

rance Company for all employees and the other with The Travelers Insurance Company for salaried personnel.

Stone maintained custody of the master contracts of insurance with these two companies, but certificates of insurance were issued to its employees. These individual certificates provided, in effect, that the insurance on any employee would terminate thirty-one days after his employment terminated or would continue only while the employee was in the employ of the employer.

Furthermore, although there was never any written contract of employment between Stone and Dogan, the company began issuing employee handbooks, the first in December, 1952. At least three successive handbooks were printed and in each instance a provision was included similar to the following under the title, "Termination of Insurance":

> When you resign or your employment is terminated, the Group Life Insurance is automatically terminated on the date the employment ends.

Although the word "retirement" is not expressly included in this provision, the intent is clear and obvious and will be construed for the purposes of this decision to embrace "retirement" as well. The court is further of the opinion that these handbooks, as well as the certificates of insurance, became part of the terms and conditions of Dogan's employment and will be so considered, again for the purposes of this decision, without further elaboration.

Notwithstanding the provisions in the handbooks, however, nor its own contractual commitment with its insurance carriers, Stone "chose not to terminate the group life insurance on retiring employees" but continued to keep the policies in force and to pay the premiums. How this was accomplished with the insurance companies without misleading or inaccurate reporting is not disclosed by the record. Stone maintained, however, that this company Policy, apparently not

recorded in its minutes nor subject to any specified guidelines, "should continue . . . as long as the Board members felt that it was economically feasible" (T. 68). The estates or beneficiaries of at least four employees who had retired before their deaths received death benefits under these group life insurance policies (T. 88).

After his retirement, however, Dogan did inquire of responsible officials of the company several times about the continuation of his life insurance and was assured that "he would always have it" (T. 10) and "not to worry; that he would always have it for the rest of his life, until his death" (T. 11, 17, 18). The defendant denies the extent of this commitment, conceding nonetheless that there were discussions on the subject and admitting that Dogan had been told that the insurance was still in force, that there were no plans to change the company policy of keeping it in force (T. 83), and that he had been reassured that the insurance would continue (T. 88-89).

Upon receiving these assurances, which the Dogans needed in order to make specific plans for the financing of extensive dental expenses, they borrowed against or, in effect, cashed in another life insurance policy, the only other that they had. This was in the year 1979, some ten years after Dogan's retirement. Understandably, then, the Dogans were quite shocked when they received the letter of August 25, 1981, from the new management of Stone (Hickory Printing Company, a North Carolina concern, having bought out Stone in 1979), advising Mr. Dogan that the company would no longer continue to provide the life insurance coverage of $8,500, and that, at age eighty-three, he could convert the policy into an individual plan at an annual premium of $1449.34.

Having been so suddenly and unexpectedly cut off from insurance coverage that had been provided for at least twelve years and in direct contradiction of express assurances that he had been given just prior to making significant financial commitments in reliance on those assurances, Dogan brought this action for

declaratory relief, filing his suit on August 30, 1983. The defendant filed its grounds of defense, generally denying the plaintiff's entitlement to any relief and urging the statute of limitations, which has not been pursued. No formal pleading, however, attacking the propriety of the remedy sought has been filed nor any such objection registered at the trial. The suggestion in the defendant's brief that the plaintiff's action is technically inappropriate, therefore, comes too late and, in any event, is without merit.

Thus to the issues which can be reduced in this case to whether or not the defendant employer should be bound by the doctrine of promissory or equitable estoppel and hence precluded by its actions from terminating the benefits it had extended to Dogan for twelve years. But for this conduct the employees' handbooks and the individual certificates of insurance would resolve the matter; Dogan's rights at the time of his retirement would have been controlled by these clear-cut expressions of company policy. As these documents state, the insurance coverage was to have been automatically terminated thirty-one days after his employment was ended. To try to torture the obvious intent of these provisions by suggesting that they should not apply to employees who retire, as distinguished from those who resign or are otherwise terminated, is stretching the claim of the plaintiff beyond its reasonable reach.

Stone, however, on the retirement of Dogan in 1969, did not insist upon its rights, but, for whatever reason, beneficent, tax-related, response to conscience, or pure oversight, it continued to carry its retired employees on its group life insurance program. It chose by its own admission, however now guarded, to abrogate, to vitiate, to void the provision calling for the automatic termination of this benefit whenever one of its employees of long-standing left its employ. In effect, it intentionally and consciously rescinded its written policy and it knew, or must have known, that the continuation of its revised policy would be relied upon by those who were the recipients of

such bounty, as the company might choose to call it, or the deserved and earned benefit, as an employee of fifty years would likely consider it. Certainly, a person in retirement is constantly concerned about insurance on his life. Providing on his death for his partner and helpmate of nearly fifty years is bound to have been a matter of moment for Mr. Dogan. Yet, in this case there is more; the Dogans expressly sought out in 1979 the reassurance that the coverage that had then been continued for ten years since retirement would be continued until his death. They needed to raise some money for extensive dental work, and they did not want to give up one insurance policy unless they knew that their company insurance would be continued. They received that assurance; they acted upon it; and now two years later, the company seeks to fall back on a provision that it had intentionally ignored and by conduct had waived for at least ten years.

This is a classic example of the type of circumstances that gave birth to the doctrine of promissory or equitable estoppel. A party should not be permitted to complain when it has set in motion, whether required to or not or even as in this case when it expressly did not have to, the receipt of certain benefits by another and should not be permitted to withdraw those benefits when that other party has come to rely on their continuation and has acted affirmatively in reliance on their promised continuation.

The basis, function and purpose of the doctrine of estoppel is well stated in 28 Am. Jur. 2d, Estoppel and Waiver, § 28:

> The doctrine of estoppel is based upon the grounds of public policy, fair dealing, good faith, and justice, and its purpose is to forbid one to speak against his own act, representations, or commitments to the injury of one to whom they were directed and who reasonably relied thereon. The doctrine of estoppel springs from equitable principles and the equities in the case. It is designed to aid the law in the administration of

justice where without its aid injustice might result. Thus, the doctrine of equitable estoppel or estoppel in pais is founded upon principles of morality and fair dealing and is intended to subserve the ends of justice.

It is the appeal to what is right and just that compels the conclusion in this case that Stone should be required to continue the insurance coverage that it promised Dogan it would do. Discussions of the doctrine of promissory or equitable estoppel, or estoppel in pais, are legion. The principles which undergird the doctrine, as suggested in 28 Am. Jur. 2d, Estoppel and Waiver, 626, "run throughout all the transactions and contracts of civilized life" and "cannot be subject to fixed and settled rules of universal application . . . . In other words, each case of estoppel must in the nature of things stand on its own bottom."

It is true, as the defendant contends, that estoppel is more usually thought of as a shield, rather than a sword; a defensive technique rather than an offensive weapon. Yet, such considerations do not preclude its application where the law might be aided in the administration of justice and where without its use an injustice would result.

Here, the injustice that would result would be depriving a man at the age of eighty-three, and more particularly his wife, of insurance benefits that had been provided him for twelve years since his retirement by the company for whom he had worked for half a century and after he had affirmatively sought the reassurance of its continuation before he cashed in the only other insurance that he had. It is simply unconscionable to hold otherwise, a conclusion that would only be in keeping with, and applauded by, the corporate conscience of the original principals of The Stone Printing and Manufacturing Company of Roanoke, Virginia.

The relief sought is granted. The defendant will either reinstate the insurance or pay the plaintiff the face amount of the policy, whichever it might elect to do.